NORTH AMERICAN DREDGING CO. v. PACIFIC MAIL S. S. CO.†

(Circuit Court of Appeals, Ninth Circuit. February 27, 1911.)

1. NAVIGABLE WATERS (§ 26*)—OBSTRUCTION—INJURY TO VESSEL—EVIDENCE.

Evidence considered, and *held* to sustain the allegation of a libelant that a wire cable by which one of the propeller tubes of its steamship was fouled in the harbor of Honolulu was left there, attached to the anchor chain of a buoy, by a dredging vessel of claimant which was employed in the harbor and using such cables as a part of her equipment.

[Ed. Note.—For other cases, see Navigable Waters, Dec. Dig. § 26.*]

2. NAVIGABLE WATERS (§ 22*)—MARITIME TORTS—NEGLIGENCE CAUSING INJURY TO VESSEL.

To place or negligently leave a wire cable attached to the anchor chain of a buoy in a harbor under water, where it is liable to cause injury to vessels using the harbor, is negligence, and constitutes a maritime tort, which subjects the wrongdoer to legal liability for the direct consequences of an injury resulting therefrom.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 132; Dec. Dig. § 22.*]

3. MARITIME LIENS (§ 3*)—LIENS FOR TORTS—VESSELS LIABLE—DREDGE.

A floating dredge, capable of carrying her own machinery and implements and working crew, when employed as an aid to commerce in deepening navigable channels and harbors, is subject to the maritime law and to a maritime lien for a tortious injury to another vessel caused by negligence of those controlling her operations.

[Ed. Note.—For other cases, see Maritime Liens, Dec. Dig. § 3.*

Maritime liens for torts, see note to The Anaces, 34 C. C. A. 565.]

4. NAVIGABLE WATERS (§ 26*)—OBSTRUCTION—LIABILITY OF VESSEL FOR MARITIME TORT—EXTENT OF LIABILITY.

When libelant's steamship Siberia was in the harbor of Honolulu on a voyage to Japan, one of her propellers became fouled by a wire cable negligently left attached to the anchor chain of a buoy by claimant's dredge. The cable was wound around the propeller tube, but, after cutting loose the anchor chain, the Siberia proceeded to Yokohama without waiting to remove the cable, with the result that quite a serious injury was done to the propeller and surrounding parts, which could have been avoided by a delay of two or three days at Honolulu. *Held*, that the dredge was not liable for such indirect and avoidable injury, and that libelant was entitled to recover only the reasonable expense of having the cable removed there, together with demurrage for the time which would have been required.

[Ed. Note.—For other cases, see Navigable Waters, Dec. Dig. § 26.*]

Appeal from the District Court of the United States for the Territory of Hawaii.

Suit in admiralty by the Pacific Mail Steamship Company, as owner of the steamship Siberia, against the steam dredge Pacific, the North American Dredging Company, claimant. Decree for libelant, and claimant appeals. Modified and affirmed.

The appellant is a corporation carrying on extensive operations in deepening and improving waterways and harbors by dredging, using for that purpose dredging vessels capable of carrying their own apparatus afloat from place to place. It has appealed this case, asking for a review by this court of a decision and decree awarding damages to the libelant in a suit in rem commenced and prosecuted against the Pacific, one of the appellant's dredging vessels. The important facts and circumstances affecting the rights of the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

† Rehearing denied May 1, 1911.

parties to the litigation, other than jurisdictional facts and formal matters, are as follows:

In the progress of a voyage from San Francisco to Oriental ports, via Honolulu, on the 10th day of November, 1905, the libelant's steamship Siberia got into trouble in the harbor of Honolulu by picking up from the bottom of the harbor and winding around her starboard propeller tube a wire cable and the anchor chain of a buoy to which the cable was attached. The Siberia is a large steamship of about 12,000 tons burden equipped for carrying passengers and freight and having a draft at her after end of a fraction more than 28 feet. At the time of the accident she was manœuvering, with the assistance of a steam tug, to get out of the inner harbor of Honolulu, and was only a few hundred feet distant from the wharf which she was leaving. With her starboard propeller fouled by the cable and chain, she proceeded out of the inner harbor to an anchorage in the open roadstead, dragging the buoy with her. A diver was sent for, who arrived about 7 p. m., and worked several hours during the night in making an examination to ascertain the nature and extent of the damages done, and to liberate the vessel from the clinging cable and chain. After the chain had been detached, it was ascertained that the cable was tightly wound around the tube, so that it could not be removed without staging to stand upon while working, and means for applying force to unwind or cut it. As the information obtained by the diver and communicated to the officers of the ship indicated that no serious damage had been done, and the opinion of the diver being that continuance of the voyage would not be attended with special danger, the captain decided to go ahead, and the ship did proceed to Yokohama, carrying the cable wrapped hard around the tube with two loose ends thereof free to vibrate, and protruding far enough to strike the propeller blades. The vibrating ends referred to were produced by cutting a bight of the cable to release the anchor chain. Before that was done the only ends of the cable were in the interior of the coil as it was wrapped around the tube. Being in that condition, the cable could not be removed by the diver without detaining the ship for one day or longer. At Yokohama another diver was employed who removed the cable, and the ship then returned to San Francisco, where she was docked and her injuries repaired. It was found that fragments of wire had been forced into the shaft bearings doing injury which necessitated removal of the propeller and withdrawal of the shaft and replacing part of the bearings with new material. The edges of the propeller blades were notched and the nuts securing them to the hub were injured. The total amount claimed by the libelant as damages, including demurrage for detention of the ship and expenditures for repairs, work done by the divers at Honolulu and Yokohama, and an alleged marine survey at San Francisco, approximate $25,000. By its decree the District Court divided the responsibility and the damages as to some of the items and reduced the libelant's claim as to other items, thereby reducing the total sum awarded to the libelant to $20,859.75.

Nathan H. Frank and Irving H. Frank, for appellant.

E. B. McClanahan and S. H. Derby, for appellee.

Before ROSS and MORROW, Circuit Judges, and HANFORD, District Judge.

HANFORD, District Judge (after stating the facts as above). Responsibility for the mishap is by the libel charged to the Pacific on the assumed ground that the wire cable which was the implement of mischief belonged to her, and that it was negligently left attached to the anchor chain of the buoy, after it had been used in the operation of dredging the harbor of Honolulu. By its answer and throughout the litigation, the appellant has strenuously contended that the cable was not part of the Pacific's equipment, and by disclaiming ownership of the line has sought to repel the charge. The evidence, however, to sustain it is ample and convincing. The most important of

the evidentiary facts established by admissions of the pleadings and the testimony are the following:

(1) At the time of the occurrence the appellant under a contract with the government of the United States was improving the harbor of Honolulu by dredging, using for that purpose the dredger called the Pacific, and on the 5th and 6th days of November, 1905, the dredger was working in the vicinity where the cable was picked up by the Siberia, and, in operating, wire cables in size and general appearance, similar to the one which caused the mishap, were used to place her and hold her in the varying positions required for dredging. Such a cable was attached to the anchor chain of the identical buoy referred to by dropping a loop over it for the purpose of using the buoy's anchor as a stationary object to heave upon, and to hold the dredger in position while working.

(2) The anchor chain which fouled the Siberia's propeller was incrusted with coral and barnacles, and the cable would have been so incrusted with a marine growth, or rusted, if it had been for a considerable time submerged in the harbor of Honolulu. It was not so, but appeared to be new, indicating that it had been recently dropped.

(3) Previous to making use of the buoy referred to, one of the Pacific's wire cables was connected to the anchor chain of another buoy in the harbor and a section of it connected to the chain had been disconnected from the dredger and left submerged. That cable was, after the mishap to the Siberia, taken up and examined by a number of persons who testified as witnesses in this case, and it was found that the loop which engaged the chain was made by bending it and uniting the end to the body of it by means of a shackle and clamps similar to a shackle and clamps found enmeshed in the coil of the cable which enwrapped the Siberia's stern tube. After it had been examined by the witnesses who testified concerning it, that section of the cable with its attachments was reclaimed by those in charge of the operations of the Pacific.

(4) Both of the buoys referred to were provided with rings for convenience in attaching mooring lines.

The foregoing undisputed facts corroborate and confirm the positive testimony given by the captain of the Pacific, to the effect that, when his vessel was disconnected from the buoy which was involved in the mishap to the Siberia, a section of the cable was left attached to it. In order to properly estimate the force of the positive testimony in favor of the libelant, consideration should be given to the absence of testimony to be expected, if the pennant which caused harm to the Siberia were not the identical pennant made use of in the operations of the Pacific in the manner above described, and it is to be noted that not a scintilla of evidence was introduced or offered tending to inculpate any vessel or craft or party other than the Pacific and her crew. This is one of the important circumstances, because it is a matter of common and general knowledge that a wire cable is valuable and difficult to handle and not a thing likely to be intentionally placed as this one was, connected to the anchor chain of a buoy and then abandoned. For another vessel to have left the cable so placed with-

out having been observed by persons who would have been called as witnesses is so improbable as to be unbelievable.

The evidence for the defense consists mainly of the testimony of the mate of the Pacific, who superintended the operation of placing the cable to engage the buoy's chain, and one other member of the crew of the Pacific who assisted him in performing that task. The important part of the mate's testimony is to the effect that he personally, with the assistance of others of the crew, took up all of the cable attached to the buoy; that the loop dropped over the buoy consisted of an entire pennant or section of cable having the two ends thereof united by a shackle larger than, and different from the shackles referred to by the other witnesses; and that the cable used was right and left lay cable, which is twisted differently from the cable which fouled the Siberia's propeller. His evidence with respect to the formation of the loop is corroborated by the testimony of his associate referred to, and counsel for the appellant endeavored, by leading questions, to have him corroborate the mate with respect to the construction of the cable, and in the argument has assumed that he did so. But the most positive statement elicited from that witness was to the effect that he did not notice the lay of the wire. Another witness called to corroborate the mate as to the lay of the wire had no information on the subject except what he had obtained by casually observing cables supposed to be for use on the Pacific, stored in a place different from the place where her stock of cables was kept, as stated by the mate, and he further evinced his incompetency by displaying ignorance as to the difference in the twist of right and left lay cables from others. There is in the record no corroboration of the mate's testimony with respect to the fact of taking up the section of the cable having the loop which was dropped over the buoy in question, and we do not find in the record any offer of any excuse for the failure to call as witnesses the men who (if his testimony were true) must have performed manual labor in removing the loop from the chain. The district judge who tried the case considered the mate to be an unreliable witness, and we find in his testimony good and sufficient reasons supporting that conclusion. The weakness of the evidence for the defense is palpable, and is one of the circumstances constituting a complete chain of circumstantial evidence corroborating the positive evidence of the captain of the Pacific that a section of cable constituting part of her equipment was left attached to the chain of the buoy.

The court is not obliged to rest its decision upon presumptions or inferences. The facts of the case and the only logical conclusion deducible therefrom may be epitomized thus: A loop of cable belonging to the Pacific was dropped over the buoy five days before the accident happened. That section of the cable was not removed from the buoy previous to the accident. Only one cable was attached to the buoy at the time of the accident. Therefore it is not merely a presumption, but a certainty, that the section of the cable so placed and left is the one which fouled the Siberia's propeller. An obstruction unlawfully placed, or negligently left, in a navigable waterway or harbor, causing an injury to a vessel afloat, is a maritime tort. The J. G.

Lindauer (D. C.) 158 Fed. 449. Submerged and concealed objects capable of harming vessels are especially vexatious. "The impinging on an anchor *or other injurious impediment negligently* left in the way has always been considered as coming within the category of maritime torts, having their remedy in the courts of admiralty." . Railroad Co. v. Tow Boat Co., 23 How. 209, 16 L. Ed. 433. To leave a wire cable attached to the anchor chain of a buoy in a harbor when not in use was obviously negligence and a menace to deep draft vessels, and therefore a legal wrong subjecting the wrongdoer to legal liability for the direct consequences. Blanchard v. Western Union Tel. Co., 60 N. Y. 510; Stephens Transp. Co. v. Western Union Tel. Co., Fed. Cas. No. 13,371; The City of Richmond (D. C.) 43 Fed. 85, affirmed in Western Union Telegraph Co. v. Inman & I. Steamship Co., 59 Fed. 365, 8 C. C. A. 152; Omslaer v. Phila. Co. (D. C.) 31 Fed. 354. A floating dredger capable of carrying her own machinery and implements and working crew, when employed as an aid to commerce in deepening navigable channels and harbors, is subject to the maritime law and to a maritime lien for a tortious injury to another vessel caused by negligence of those controlling her operations. 1 Am. & Eng. Enc. of Law (2d Ed.) 655; 1 Am. & Eng. Enc. of L. & Pr. 1237; McRae v. Bowers Dredging Co. (C. C.) 86 Fed. 344; Bowers Dredging Co. v. Federal Contracting Co. (D. C.) 148 Fed. 290, affirmed 153 Fed. 870, 83 C. C. A. 52; Charles Barnes Co. v. One Dredge Boat (D. C.) 169 Fed. 895. In this instance the injury was to a ship afloat on public navigable water and was a consequence of negligence on the part of the crew operating the dredging vessel, and the cable which was the instrument by which the injury was inflicted was part of her equipment, and by the maritime law she is deemed an offending thing. Therefore a suit in rem for damages is maintainable. 19 Am. & Eng. Enc. of Law (2d Ed.) 1117; 1 Am. & Eng. Enc. of L. & Pr. 1285; The China, 7 Wall. 53, 19 L. Ed. 67; The Tiber, Fed. Cas. No. 8,715; The Commodore (D. C.) 40 Fed. 258; The General De Sonis (D. C.) 179 Fed. 126. As in other cases for the recovery of damage for a tort, the burden rests upon the libelant to prove the extent of the injury and the amount of the actual loss incurred, as a direct or necessary consequence of the wrong complained of. The Rickmers, 142 Fed. 305, 73 C. C. A. 415; California Nav. & Imp. Co. v. Union Transp. Co., 176 Fed. 533, 100 C. C. A. 21.

Therefore the amount of damages for which the Pacific is liable is to be measured and limited by the amount of the loss proved, and she is not liable for expenses and losses resulting from the imprudence or mismanagement of the Siberia's officers subsequent to the discovery on their part of the predicament in which she was placed by the fouling of her propeller. At that time the Siberia was in a safe harbor and with the assistance of the tug and the use of her port propeller, she could have returned to her mooring at the wharf without danger of additional injury. There she could have been extricated from the cable and chain with an expenditure of only a few hundred dollars and by waiting for daylight a survey could have been made, whereby satisfactory evidence could have been secured to determine whether

any injury to her propeller blades, or shaft by contact with the cable and chain had been sustained, and the necessary interruption of her voyage would not have caused loss by delay exceeding lawful demurrage for one or two or three days. Every consideration for the safety of the ship, her passengers, cargo, and the mail which she carried and the interests of her owner with respect to its right to recover damages, and the legal duty to minimize the damages, should have prompted a prudent captain to have adopted that course. It was an inexcusable error for him to take the ship out of the harbor with her entanglements, and then to proceed to Yokohama with the cable still enwrapped upon the tube, with the loose ends thereof whipping the propeller blades with every revolution. The only evidence on the subject proves that, before proceeding, one of the blades on examination by the diver was found to be uninjured, but after the voyage to Yokohama the edges of all of the blades were found to be indented by scraping or grinding upon some hard substance, which can be accounted for only upon the theory that the vibrating ends of the cable caused that injury. It is not proved that any fragments of wire were forced into the shaft bearings before the cable had been cut. The evidence does not prove when or how the nuts which united the blades to the propeller hub were damaged. The Pacific is liable for the necessary expense of removing the cable and chain from the propeller, for incidental expenses including the hire of the tug for additional service, and for demurrage for the time which the Siberia would have been delayed at Honolulu. All of the other expenditures and losses are, according to a preponderance of the evidence, attributable to the errors of the captain of the Siberia above specified.

The bill for the survey made at San Francisco is not a legitimate charge, because the report of the survey shows upon its face that it is utterly worthless, and made too late to affect any rights of the parties involved in this suit. An award of demurrage for three days at the rate of $860 per day and $1,000 to cover all expenses for which the Pacific is liable, with interest at the rate of 6 per cent. per annum from November 10, 1905, and costs, will be quite as liberal to the libelant as the evidence justifies.

The cause will be remanded, with directions to modify the decree to conform to this opinion.