## NEW YORK TELEPHONE CO. et al. v. CITIES SERVICE TRANSP. CO. et al.

### No. 14005.

District Court, E. D. New York.
May 17, 1938.

Charles T. Russell, of New York City (Irving W. Young, Jr., and H. N. Wells, both of New York City, of counsel), for libelants.

Hatch & Wolfe, of New York City (Carver W. Wolfe and Henry P. Elliott, both of New York City, of counsel), for respondent Cities Service Transp. Co.

Macklin, Brown, Lenahan & Speer, of New York City. (Paul Speer, of New York City, of counsel), for Reading Co. and others.

ABRUZZO, District Judge.

This is a libel brought by the owners of a submarine cable laid upon and across the bed of the Kill Von Kull from Port Richmond, Staten Island, in the state of New York, to Bayonne in the state of New Jersey. The cable relayed telephone messages between the city and state of New York and various points in the United States. The messages related to matters of maritime import.

The claim of the libelants is that on February 6, 1932, the oil tanker Cities Service Empire, owned by the respondent Cities Service Transportation Company, fouled its anchor upon the libelants' cable, destroying same.

At the time of the occurrence of the fouling of the cable, the tanker was proceeding westwardly through the Kill Von Kull.

Respondent Reading Company was the owner of the steamtugs Bern and Ashbourne, and Fred B. Dalzell, with others, was the owner of the steamtug Bulley. They were in charge of a tow consisting of 26 coal boats and were proceeding in the opposite direction from the tanker Cities Service Empire.

The owners of the Empire claim they were not at fault, either wholly or in part, for the fouling of this submarine telephone cable. Their contention is that the towing tugs of the coal boats were solely responsible for the fouling of this cable.

The tanker Empire was proceeding in a narrow channel. Only 400 feet of this channel were available for the tanker to use, due to the draft she would take. If she steered to the right or the left of this 400 feet section she would smell bottom. After the tanker approached the tow, she gave a warning that she intended to make a starboard to starboard passing. This tow was approximately 1,300 feet in length. While passing the tow and abreast of some part of it, the tanker claims that the coal boats were caused to angle toward her. This angling of the tow forced the Empire into a position of danger. She had to be steered so as to avoid a collision with the tow. She also had to be steered so as to avoid running on the reefs near Staten Island. The anchor was thrown out to accomplish these results. At least, that was the theory advanced by the Empire. There was no collision nor did the Empire pile on the reefs. The cable, however, was fouled.

■ The experienced navigator of the Empire had been over the channel many times and was cognizant of the physical conditions which he of necessity had to meet. In making a starboard to starboard passing, the navigator of the Empire had to bear slightly to the right before either the passing of the end of the tow or immediately thereafter. The tanker could not be steered outside of this 400 feet space of the deep water channel. Under the evidence as presented, the court cannot find that the tow was not proceeding in the proper and usual manner. There was no angling. It can find no negligence on the part of the tugboats towing these coal boats. The anchor of the Empire was not thrown out because of any careless or negligent handling of this tow.

On the contrary, the anchor was thrown out because of the careless and negligent manner of operating and steering the Empire. It was proceeding at an excessive rate of speed and was not under proper control. The improper manner in which the Empire was steered interfered with the swing under the starboard helm which it had to make.

Under all the circumstances and conditions confronting the navigator of the Empire, its excessive rate of speed and improper handling necessitated the throwing out of its anchor. It is therefore, responsible for the damage caused.

Lack of jurisdiction in admiralty is urged as a complete defense. The case of Nippon Yusen Kabushiki Kaisha v. Great Western Power Co., 9 Cir., 17 F. 2d 239, is cited in support of that defense. Instead of a submarine telephone cable being damaged as appears in the case at bar, a power cable was fouled. It was indicated clearly that this power cable provided power on land only and it did not have any connection with shipping or water-borne commerce.

■ On the other hand, the libelants cite Postal Telegraph Cable Co. v. P. Sanford Ross. Inc., D.C., 221 F. 105, and U. S. v. North German Lloyd, D.C., 239 F. 587, in support of jurisdiction in admiralty. The doctrine enunciated in the Postal Telegraph Cable Co. Case seems to be more logical and should be followed. Heretofore, upon the exceptions to the libel, this court cited with approval and followed the doctrine of the Postal Telegraph Cable Co. Case. In the instant case, the cable was laid upon and across the bed of the Kill Von Kull from Port Richmond, Staten Island, in the State of New York, to Bayonne, in the State of New Jersey. This crossing came within the navigable waters of the Port of New York. The submarine telephone cable had been in active use and operation on the part of the libelants for the rendering of telephone message service between the city and state of New York and various points

in the United States, and the messages, among other things, related to matters of maritime import. These facts are not in dispute; particularly, that these telephone messages related to matters of maritime import. To that extent, the case is distinguishable from the Nippon Yusen Kabushiki Kaisha Case and comes squarely within the doctrine as laid down in the Postal Telegraph Cable Co. Case. Therefore, the court has jurisdiction in admiralty.

A decree should be entered for the libelants against the Cities Service Transportation Company, owner of the tanker Empire.

Submit decree in accordance with this decision on two days' notice. ·